### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**BERNADINE JOHNSON,**

  **Plaintiff,**

   **v.**

**ERIK K. SHINSEKI**[1]

**Secretary, U.S. Department of Veterans Affairs,**

  **Defendant.**

**Civil Action No.: 08-1103 (JDB)**

### MEMORANDUM OPINION

  Plaintiff Bernadine Johnson ("Johnson" or "plaintiff") brings this action against the Secretary of the Department of Veterans Affairs ("Secretary" or "Department") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f)(3), based on alleged sexual harassment by a fellow employee at the Department. Currently before the Court is the Secretary's motion for summary judgment.   For the reasons discussed below, the motion will be denied.

### BACKGROUND

  Johnson began work at the Washington, D.C. Veterans Affairs Medical Center in the Mental Health Service, Substance Abuse Rehabilitation Program ("SARP"), in 1987 as a unit clerk and, in 1996 or 1997, became a resource manager at SARP.  Pl.'s Dep. 6:20-21, 8:13-

---

[1] The complaint originally named as defendant James B. Peake in his capacity as Secretary of the United States Department of Veterans Affairs. Pursuant to Fed. R. Civ. P. 25(d), the current Secretary Eric K. Shinseki is automatically substituted as defendant.

10:12.  As a resource manager, Johnson's duties included keeping the office supplies well

stocked and interacting with patients, which involved tasks such as setting appointments and

obtaining information related to visits.  <u>See</u> Pl.'s Dep. 12:23-13:24, 16:4-16; Clarke-Stone Dep.

196:16-197:9. As required by the sexual harassment policy in place at the Department, Johnson

was required to attend -- and did attend, by watching video tapes -- prevention of sexual

harassment training every two years.  <u>See</u> Pl.'s Resp. to Def.'s Statement of Mat. Facts ("Pl.'s

Stmt.") at 17-21.  At all times relevant to this action, Johnson's first-line supervisor Karen Clark-

Stone was the program coordinator for SARP and her second-line supervisor Linda Jordan was

the chief nurse at SARP.  Pl.'s Stmt. at 2.  As an employee within SARP, Johnson had regular

contact with Isaiah Pearson, a SARP counselor and supervisor for other counselors. <u>See</u> Pearson

Dep. 127:18-128:7.  While Pearson did occasionally complain about Johnson's work and

Johnson told her managers that Pearson was "bossy," it is undisputed that Pearson was not a

supervisor in Johnson's chain of command.  <u>See</u> Clark-Stone Dep. 102:14-16, 110:11-17 &

152:18-21; Pl.'s Stmt. at 3.

    The exact nature of Johnson's relationship with Pearson is unclear, as several of Johnson's

co-workers claim that they were part of a clique of friends that had a family-style relationship.

<u>See</u> Givens Dep. at 201:20 ("We were a family"); McCray Dep. at 81:8-13 ("We was all like a

family.  We did everything, we talked about everything . . . . If one was in trouble, we all helped

out."); Pearson Dep. at 148:16-22 ("The work culture was that we had a family, close

relationship.  We were very casual.  We were about our business of doing the work we was

getting paid to do, but during free time or time that we, you know, it was very casual,

informal.").  Johnson disputes this "family" description.  <u>See</u> Pl.'s Dep. 80:13-14.  Regardless of

the exact nature of the relationship between Johnson, Pearson, and other co-workers, it is

undisputed that the SARP "office culture" included banter, both of a sexual and non-sexual nature, see, e.g., McCray Dep. 226:17-19 ("There is always something said with SARP. Someone always said something sexual, I don't care what the matter was."), sexual jokes, see, e.g., McCray Dep. 92:17-93:3 ("[W]e would joke in that manner about how the [diabetes] medication, how it affect men [sexually]."), conversations about sexual relationships, see, e.g., Taylor Dep. at 92:10-18 (The group would make jokes like, "'Well, look at your butt.  Look at your behind.  I can ride that.'"), sexual gestures, see, e.g., Givens Dep. 121:16-122:2 (answering affirmatively that Johnson "would lift up her skirt kind of flirty or humorously"), and physical contact among group members, see, e.g., Taylor Dep. 93:17-21 (explaining that as part of the joking they would "grab each other, hug them, kiss them").  Johnson does not dispute this co-worker testimony, though she does argue that "there is no suggestion that [she] engaged in sex-based conduct that was unwelcome to others or that interfered in any way with any employee's employment." See Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 4.  The SARP employees refrained from engaging in sexual banter if a supervisor was present.  See McCray Dep. at 97:11-14 ("[I]f Ms. Clark-Stone would come in the room, they would say, 'phone off the hook,' and that's somebody who wasn't in our circle that we wouldn't talk around . . . . We wouldn't talk that way if they would come in."); Taylor Dep. 92:5-6 ("[We would] kind of curb the words that we are saying a little bit" in front of Clark-Stone.).

The timing of this office banter is not entirely clear, though Johnson claims with respect to Pearson that he has engaged in sexually-charged behavior since the 1990s, and that such behavior changed over time from verbal comments to physical harassment, with Pearson most recently harassing her by touching her inappropriately on July 18, 2005.  Report of Investigation ("ROI") Tab B-1, Johnson Decl. ¶¶ 8, 26 (May 22, 2006) ("ROI Tab B-1").  Johnson claims that

Pearson made inappropriate comments to her beginning in the 1990s, Pl.'s Dep. 108:19-2, but that "[she] thought [she] could handle the talking," so she did not tell her supervisors about it. See Pl.'s Dep 109:11.  The Secretary claims that the first alleged physical contact between Johnson and Pearson could not have been any earlier than June 2005 and consisted of a slap on the behind.  See Reply in Supp. of Def.'s Mot. for Summ. J. at 6.  Johnson disagrees with this time estimate, instead placing the complained-of touching in or around January 2005, and claiming that she told her first line supervisor, Clark-Stone, about Pearson's conduct several times prior to August 2005.  See ROI B-1 ¶ 8, 14; Pl.'s Decl. ¶ 3 ("When he first touched me in 2005 I reported him to my supervisor, Karen Clark-Stone.  I believe I talked with Karen Clark-Stone in January/February 2005.").  According to Johnson, Pearson's behavior became more aggressive in the 2000s, and became worse in early 2005, when John Uqdah -- her workplace friend and co-worker – retired, as Pearson accused Johnson of having a sexual relationship with Uqdah, sexually propositioned her, and "tried to kiss her, grabbed and pinched her breast, and grabbed and spanked her buttocks." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 1-2.  Johnson also claims that Pearson came into her office uninvited, "walked around [Johnson's] desk, towered over [Johnson], [and] tried to kiss [Johnson], and then ridiculed her when [she] refused to participate." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 2, n. 1 (citing Guinta Dep. 57:4-58:15).  Moreover, following Uqdah's departure, Johnson claims that Pearson told her that with Uqdah's retirement, she would "have no one in the workforce to protect her," Pl.'s Stmt. at 10.

Clark-Stone denies that Johnson ever informed her of any sexual misconduct by Pearson, see Clark-Stone Dep. 152:2-9, although Johnson claims that she informed Clark-Stone a number of times about Pearson's misconduct in 2005.  It is undisputed that Johnson did meet with her

second-line supervisor, Linda Jordan, in July or August 2005 to complain of Pearson's alleged touching of her backside.  See Jordan Dep. 27:1-3 ("It was summer, July, August.").  At this meeting, Jordan claims that she immediately offered to "move [Johnson] off the unit," Jordan Dep. 29:1-4, but Johnson denies that any such offer was made, ROI  Tab B-1 ¶ 4, and claims that -- despite repeated meetings with her supervisors concerning Pearson's behavior before August 2005 -- they "did nothing," Pl.'s Opp.'n to Def.'s Mot. for Summ. J. at 2.

Johnson visited the Department of Veterans Affairs Equal Employment Opportunity ("EEO") office on August 9 and 10, 2005 to formally pursue her complaints about Pearson's alleged misconduct.  Pl.'s Opp.'n to Def.'s Mot. for Summ. J. at 2.  During these meetings, Johnson reported to the EEO staff that Pearson made inappropriate sexual comments and had inappropriately "tapped her on the butt", which took place "months ago."  See Def.'s Mot. for Summ. J. at 3; George Dep. 110:6-12, 155:3-6.  On August 11, 2005, managers at the Department of Veterans Affairs met with Pearson and escorted him to the EEO office, where he was questioned and informed that these sexual harassment allegations were serious and that such behavior would be punished.  See ROI Tab B-4 at 11.  Pearson was placed on two days of paid administrative leave "[t]o ensure that no other incident occurred in the immediate aftermath of the allegation." ROI Tab B-5 ¶ 16; Pearson Dep. 210:7-11.  The Department commenced a formal investigation into Johnson's allegations on or shortly after Johnson's meetings with the EEO office, Pl.'s Stmt. at 17, although this investigation "did not lead to a reprimand for Pearson." Def.'s Mot. for Summ. J. at 26.  The Department also conducted additional sexual harassment training for Pearson, Johnson's supervisors, and Johnson's co-workers.  Pl.'s Stmt. at 17 ("Plaintiff does not dispute Defendant's assertion that it provided sexual harassment training

to its employees in the SARP unit *after* Plaintiff complained of Mr. Person's [sic] sexual harassment.").

Following her formal complaint to the EEO office, the Department also arranged for Johnson to be given paid administrative leave and, it contends, offered to give Johnson a new position in an area of the Department separated from Pearson.  See Pl.'s Stmt. at 15-16. However, Johnson disputes whether any alternative positions were actually offered, claiming that such positions were merely "discussed." Id. at 16.  Regardless, Johnson left her position in the Mental Health Service SARP after August 10, 2005 and did not return to work at the Department until 2008, when "[she] was released by her doctor to return to work at a location other than the Mental Health Service . . . on a part-time basis." Id.  Johnson states that, in making the determination to come back to work at the Department, her doctor asked her how she felt, and she "told him [she] was fearful," that she "didn't know what reaction [she] was going to have," and that "if [she] ran into Mr. Pearson or if he ran into me, I didn't know, I didn't know what to expect, I didn't know." Pl.'s Dep 165:13-17.  Johnson's doctor responded by mandating that Johnson could only return to work part-time and that "[s]he is not able to work at Mental Health at the VA in Washington, DC.  She needs to work in a different area at the VA." Pl.'s Exh. 2.

On June 25, 2008, Johnson filed a complaint in this Court, alleging that Pearson "subjected Plaintiff to a course of sex-based misconduct that included sexual banter, solicitations for sexual activities, inquiries regarding Plaintiff's private sexual activities, physical contacts with private parts of Plaintiff's body, and . . . accusations that Plaintiff was having sex with a former co-worker." Compl. ¶ 7. Johnson claims that this misconduct created a hostile work environment that "constitutes unlawful sex discrimination and harassment within the meaning of Title VII." Id. ¶¶ 8, 13.  On October 15, 2008, the Secretary filed a motion to dismiss or, in the

alternative, for summary judgment, on the ground that Johnson failed to exhaust her administrative remedies before bringing her claim to this Court.  The Court treated the motion as a motion for summary judgment and denied it.  See Johnson v. Peake, 634 F. Supp. 2d 27, 33 (D.D.C. 2009).  Now, post-discovery, the Secretary has filed a second motion for summary judgment, on the basis that because Pearson was Johnson's co-worker, the Department should not be held liable for any harassment by him because it "neither knew nor should have known of the alleged harassment" and because it "took prompt and appropriate corrective action." Def.'s Mot. for Summ. J. at 1.

### STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  As part of this deference to the non-movant, the Court "may not

make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  <u>Id.</u> at 252.  In order to prevail, the non-movant's opposition must contain more than "unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." <u>Carter v. Greenspan</u>, 304 F. Supp. 2d 13, 21 (D.D.C. 2004).  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  <u>Celotex</u>, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." <u>Id.</u> at 252.

## <u>ANALYSIS</u>

As a preliminary matter, the Secretary contends that this Court should disregard Johnson's post-discovery declaration filed in conjunction with his opposition to the motion for summary judgment on the basis of the "sham-affidavit rule."  Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 6-8.  The Secretary claims that this declaration should not be part of the record because it contradicts Johnson's earlier testimony regarding the timing of her first alleged physical contact with Pearson and her first report to management of this alleged misconduct.  <u>Id.</u> at 7.  In addition, the Secretary argues that the co-worker liability standard -- rather than the supervisor liability standard -- should be applied to this case.  The Court addresses these arguments in turn.

I.      **Johnson's Post-Discovery Declaration**

As has been noted by the D.C. Circuit, "[v]irtually every circuit has adopted a form of the so-called 'sham-affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the "shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony. Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991)).  However, "[i]f the supplemental affidavit [or declaration] does not contradict but instead clarifies the prior sworn statement, then it is usually considered admissible." Galvin, 488 F.3d at 1030.  Taking these two legal principles together, courts in this district have applied the sham-affidavit rule when "'the affidavit [or declaration] . . . clearly contradict[s] prior sworn testimony, rather than clarif[ies] confusing or ambiguous testimony, and the contradiction lacks credible explanation.'" St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc., 573 F. Supp. 2d 152, 160 (D.D.C. 2008) (quoting Hinch v. Lucy Webb Hayes Nat'l Training Sch., 814 A.2d 926, 930 (D.C. 2003)) (emphasis added); see also Barrett v. Chreky, 634 F. Supp. 2d 33, 37 (D.D.C. 2009) (finding no violation of the sham-affidavit rule because the plaintiff did not "directly contradict herself" in her supplemental affidavit).

Here, the Department contends that the Court should refuse to consider Johnson's supplemental declaration on the basis of the sham-affidavit rule because her post-discovery declaration states that Johnson first spoke with her supervisors in January or February of 2005, which purportedly contradicts her testimony from her 2006 declaration and 2010 deposition that her first report to management "occurred no earlier than June 2005." Def.'s Reply at 7.  But a close reading of Johnson's earlier testimony and statements, including her 2006 declaration, 2010

deposition, and 2010 post-discovery declaration, fails to show that Johnson's declaration "clearly" contradicted her prior testimony. Indeed, far from definitively pointing to June 2005 as the timeframe for Johnson's first report of sexual harassment to her supervisors, Johnson's prior statements on the subject are ambiguous. The best that can be said for this testimony is that one could infer that Johnson may have first reported instances of sexual harassment in June or July 2005, but Johnson's previous testimony does not <u>clearly</u> commit to that timeframe.

For example, the Secretary points to Johnson's statement in her 2006 declaration that "on/about July 11, 2005, Mr. Pearson touched my buttocks" to argue that Johnson previously testified that the first touching incident, which prompted her first report to management, occurred on July 11, 2005. <u>See</u> Def.'s Reply at 7-8 (quoting ROI Tab B-1 ¶ 26). But the Secretary overstates the clarity of this testimony, as Johnson's 2006 declaration was a specific response to Question 26 of an investigatory questionnaire, asking:

> Since the date of the incident (July 11, 2005), have any other sexual harassment incidents taken place? If yes, when and what took place, who did you report it to and what action, if any, was taken?

Pl. Exh. 24 ¶ 26. The question does not ask whether this was the first incident of touching or whether Johnson spoke to her supervisors about sexual harassment at any point <u>before</u> July 11, 2005, and hence Johnson did not definitively place the timeframe for her first report to management in the June or July 2005 -- rather than the January or February 2005 -- timeframe. The Secretary suggests that any reasonable person would have mentioned such prior incidents and reports in response to this and other questions in the questionnaire, <u>see</u> Def.'s Resp. to Pl.'s Surreply at 2-3, n. 1 ("By her lack of response, one could conclude from the 2006 Declaration that there were no other incidents of alleged physical contact . . ."), but this argument simply goes to the weight that should be given to the 2006 and 2010 declarations and does not make the

post-discovery declaration a clearly contradictory "sham" that should be disregarded by the

Court.

Similarly, the Secretary's claim that Johnson's 2010 deposition testimony unequivocally

places the first touching incident and subsequent report to management in the June or July 2005

timeframe is overstated.  Again, while Johnson's testimony may <u>suggest</u> a June or July meeting

with supervisors regarding an alleged sexual harassment incident, it does not <u>clearly</u> commit to

that period of time.  Relevant excerpts from Johnson's deposition include the following:

> Q: Now, when did this alleged harassment begin?
> A: The things that he was saying started in the '90s.
> Q: Did his behavior change over time?
> A: Yes.
> Q: Can you explain that?
> A: He was more aggressive.
> Q: In the 2000s, what did it consist of? . . .
> A: Him touching on my body, trying to kiss me, hitting me a number of times on my behind, touching my breasts, trying to kiss me.
> . . .
> Q: Did you ever tell anyone about these events?
> A: Yes.
> Q: Did you ever tell them at the time that they occurred?
> A: Ms. Clark Stone.
> . . .
> A: I don't remember the date.
> Q: The first time Mr. Pearson put his hands on you, did you go to Ms. Clark Stone?
> A: I remember I went to Ms. Clark Stone.
> Q: And did you tell her that Mr. Pearson had touched you?
> A: Yes.
> Q: And what time frame was this?
> A: This was in the 2000s.
> . . .
> Q: What time of year was it?
> A: I don't remember the time of the year.
> Q: Was this before you left the V.A.?
> A: Yeah, it happened before I left V.A.
> Q: Do you remember what month you left V.A.?
> A: August.
> Q: Okay.  So how close from the slap on the behind to August of 2005 did this happen?
> A: Within a couple months.
> . . .

> Q: When it came time – when it came to the physical touching, that went across the line and you went to Ms. Clark Stone.  Is that correct?
> A: Yes.
> Q: And that was the first smack on the behind?
> A: (No response.)

Pl.'s Dep. 101:19-112:6.

Johnson's deposition testimony is that the alleged physical harassment occurred in the "2000s" but that she could not "remember the time of the year." The most definitive statement regarding the timeframe of the first touching and subsequent report to management is that it occurred "[w]ithin a couple months" of Johnson's August 2005 departure from the Department of Veterans Affairs, but what Johnson meant by "a couple months" is uncertain. Moreover, Johnson suggests that there were several different incidents where Pearson allegedly touched her behind, making it possible that she confused the timeframe for when the first touching occurred and when she first reported this contact to her supervisors.  Accordingly, the Court "cannot find within the deposition testimony any unambiguous assertion that is directly contradicted by the later [declaration]," and the Court therefore "must conclude that a 'sham' would be too expansive a characterization of the testimony and the later [declaration]." Hinch v. Lucy Webb Hayes Nat'l Training Sch., 814 A.2d 926, 931 (D.C. 2003).

But even if Johnson's 2010 declaration that she "believe[s] [she] talked with Karen Clarke-Stone [sic] in January/February 2005" is considered contradictory to her prior 2006 declaration and her 2010 deposition, Johnson has offered an explanation for why her testimony has changed.  See Galvin, 488 F.3d at 1030; St. Paul Mercury Ins. Co., 573 F. Supp. 2d at 160. Johnson states that she:

> has determined that her work friend, John Uqdah, although scheduled to retire in March, [sic] 2005 left the workplace in/about January 2005 using his accumulated leave.  That circumstance serves to refresh Plaintiff's memory regarding Pearson's sex-based misconduct in 2005.  Pearson stated to Plaintiff that with Mr. Uqdah's retirement,

> Plaintiff would have no one in the workforce to protect her.  Plaintiff believes that Pearson started his offensive physical conduct in/about January 2005 and that she first complained to Ms. Karen Clark-Stone within the month thereafter.

Pl.'s Stmt. at 10-11 (internal citations omitted).  The Secretary responds to this explanation with skepticism, arguing that "[p]laintiff had specifically noted the connection between Uqdah's retirement and the alleged harassment in her 2006 Declaration but did not allege in her 2006 Declaration that there were any incidents of touching in January or February 2005." Def.'s Resp. to Pl.'s Surreply at 6.  However, other courts in this jurisdiction have accepted seemingly contradictory testimony based on an even lesser showing than was provided here.  See Barrett, 634 F. Supp. 2d at 37 (accepting contradicting affidavit even though plaintiff's only explanation for the contradictory testimony is that "she had simply forgotten, [at the time of the deposition], the most recent incident" of sexual harassment).  While the ambiguity and lack of clarity attributed to Johnson's statements and testimony could certainly cause a reasonable juror to question Johnson's credibility, her post-discovery declaration does not trigger the applicability of the sham-affidavit rule, as the declaration does not clearly contradict prior testimony and, instead, appears to "clarify confusing or ambiguous testimony." St. Paul Mercury Ins. Co., 573 F. Supp. 2d at 160.  Moreover, Uqdah has also confirmed the timeframe for his retirement as January 2005.  See Uqdah Decl. ¶ 6 (Oct. 8, 2010).  Accordingly, the Court will consider Johnson's post-discovery declaration as part of the relevant record.

## II.    Hostile Work Environment Claim

The Court now turns to the merits of the summary judgment motion.  Johnson's complaint asserts that Pearson "subjected Plaintiff to a course of sex-based misconduct . . . [that] was sufficiently severe or pervasive as to render Plaintiff's work environment hostile." Compl. at ¶¶ 7-8.  Title VII of the 1964 Civil Rights Act makes it unlawful for an employer "to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). The Supreme Court has recognized sexual harassment as a form of sex-based discrimination. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex.") (citation omitted).  A sexual harassment claim states a violation of Title VII if the alleged conduct "alters, either expressly or constructively, the terms or conditions of an individual's employment." Curry v. Dist. of Columbia, 195 F.3d 654, 659 (D.C. Cir. 1999) (per curium).  Courts describe an express alteration as "*quid pro quo*" harassment and a constructive alteration as "hostile work environment" harassment. Burlington Indus., Inc. v. Elerth, 524 U.S. 742, 752 (1998); Curry, 195 F.3d at 659.  Johnson has not alleged any kind of "*quid pro quo*" harassment and, based on the record, there is no indication that "*quid pro quo*" harassment is at issue in this case.  Accordingly, the Court proceeds with considering Johnson's hostile work environment harassment claim.

The workplace environment becomes "hostile" for purposes of Title VII and legal relief only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quotation omitted).  To establish a prima facie hostile work environment claim based on sexual harassment, Johnson must allege facts demonstrating that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation

of the hostile work environment.  See Burton v. Batista, 339 F. Supp. 2d 97, 106-07 (D.D.C. 2004) (citing Jones v. Billington, 12 F. Supp 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998)).  Although a plaintiff is not required to plead a prima facie case of hostile work environment, the alleged facts must nevertheless support such a claim.  See Matta v. Snow, Civ. A. No. 02-862, 2005 WL 3454334, at *29 (D.D.C. Dec. 16, 2005) (citing Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000)).  In order for a hostile work setting to be actionable, the environment must be both objectively and subjectively hostile, which means that a reasonable person would find the environment hostile or abusive and that the victim perceived it to be so.  See Faragher v. Boca Raton, 524 U.S. 775, 787 (1998).  The totality of the circumstances must be examined in making this determination.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Although no single factor is determinative, these circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.

Johnson claims that (1) she is female, (2) Pearson harassed her and this harassment was "unwelcome and [she] let him know [it was] unwelcome," and (3) she "believe[s] Mr. Pearson did what he did because [she is] a female."  See ROI Tab B-1, 1-4; see also Akonji v. Unity Healthcare, Inc., 517 F. Supp. 2d 83, 97 (D.D.C. 2007) (noting that when alleged sexual harassment is committed by a man against a woman, courts "may infer that the third element of a prima facie case is satisfied")."  Johnson also alleges that she was a victim of sex-based misconduct that "was sufficiently severe or pervasive as to render Plaintiff's work environment hostile," and that such "misconduct constitutes unlawful sex discrimination and harassment within the meaning of Title VII." See Compl. ¶¶ 8, 14.  She further claims that "Mr. Pearson's

behavior degraded me, humiliated me, made me angry and sick to my stomach.  I felt helpless, frightened and depressed." See ROI Tab B-1, 1-4.

Although the first three elements of the prima facie case are easily satisfied, it is less clear from the parties' pleadings whether the alleged sexual harassment was so "'severe or pervasive' that it 'altered the conditions of [Johnson's] employment and create[d] an abusive working environment.'" Akonji, 517 F. Supp. 2d at 97 (quoting Harris, 510 U.S. at 21).  The Secretary does not address the severity or pervasiveness of Pearson's conduct, nor does he address the effect it had on the terms and conditions of Johnson's employment and Johnson herself.  Indeed, the Secretary does not consider at all whether Pearson's conduct constituted harassment; instead, he contends that the Department is not liable *even if* the harassment occurred.  See Def.'s Mot. for Summ. J. at 12 ("The Defendant does not discuss in this motion whether the alleged misconduct constitutes harassment.  Even if the acts of alleged misconduct occurred and assuming, *arguendo*, they constitute harassment, the Defendant would not be liable for the alleged harassment.").

Johnson, however, has pointed to specific evidence from depositions, declarations, medical records, and other testimony in the record before this Court that raise a genuine factual dispute as to whether she experienced a hostile work environment.  Johnson alleges that -- beginning in 1997 -- Pearson made inappropriate comments to her, Pl.'s Dep. 108:3-22, and that this behavior became more aggressive over time, and escalated during the timeframe of John Uqdah's retirement.  At that point, Johnson claims that Pearson threatened her, Pl.'s Stmt. at 10 ("Plaintiff would have no one in the workforce to protect her"), and began a course of physical intimidation and contact with Johnson that included attempts to kiss her, uninvited visits to her office, solicitations for sex, grabbing and pinching of her breast, and grabbing and spanking of

her behind.  See Pl.'s Opp.'n to Def.'s Mot. for Summ. J. at 1-2; Guinta Dep. at 57:4-58:15; Pl.'s

Dep. 105:11, 24 & 107:2-3.  In response to this behavior, Johnson complained to her supervisors

and eventually left the workforce and sought medical treatment "for the job stress created by the

sexual harassment." See Pl.'s Opp.'n to Def.'s Mot. for Summ. J. at 2 n. 2.  Johnson did not return

to the Department of Veterans Affairs until almost three years later -- and only then on a part-

time basis.  Id.; see also Pl.'s Ex. 2.  This conduct is certainly inappropriate for the workplace,

and a jury could find that the escalating nature of Pearson's harassment is evidence of a hostile

work environment.  See Baker v. Library of Congress, 260 F. Supp. 2d 59, 67 (D.C. Cir. 2003)

(finding that sex-based comments that increased in frequency and severity over time were

evidence of a hostile work environment); Simms v. Ctr. for Corr. Health & Policy Studies, Civ.

No. 06-2178 (RCL), 2011 WL 2621325, *14 (D.D.C. July 5, 2011) (finding that harassment that

escalated over time could constitute a hostile work environment).  Moreover, "evidence of

[Johnson's] mental state during this period provides further proof upon which a jury could find

the existence of a hostile work environment." Simms, 2011 WL 2621325, at *15.  Johnson has

alleged that Pearson verbally harassed her and that this harassment eventually escalated to

physical harassment in 2005.  Johnson has also presented evidence that this harassment caused

her to leave the workplace in 2005 and seek medical help from mental counselors, which delayed

her return to the workplace until 2008.  See Pl.'s Exs. 2-4. "Taken together, these allegations are

all evidence upon which a jury could conclude that a reasonable person in [Johnson's] position

would have felt trapped in a hostile work environment." See id. at *16.

Hence, in considering the evidence in the record as described above, and drawing all

inferences in the light most favorable to the non-movant (especially in the absence of arguments

by the Secretary to the contrary), the Court concludes that Johnson has sufficiently established

elements (1) through (4) of the hostile work environment prima facie case and focuses its analysis on the only real point of contention between the parties -- whether the Department of Veterans Affairs can be held liable for the alleged harassment by Pearson.

## A.  "Supervisor" or "Co-Worker Liability"

To determine whether an employer is liable for a hostile work environment claim premised on sexual harassment, courts must first consider the threshold question whether the alleged harasser is the victim's supervisor or a co-worker.  See Faragher, 524 U.S. at 805; Curry, 195 F.3d at 559 (explaining that courts have applied different standards depending on whether alleged harassment was committed by co-worker or supervisor).

If the harasser is the victim's supervisor, courts have made it easier to hold the employer liable on a vicarious liability theory.  See, e.g., Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Jones v. Dist. of Columbia, 346 F. Supp. 2d 25, 43 (D.D.C. 2004), rev'd in part on other grounds, Jones v. D.C. Dep't of Corr., 429 F.3d 276 (D.C. Cir. 2005) ("The Supreme Court has made it easier for employees to establish sexual harassment claims when the alleged harasser is a supervisor than when the alleged harasser is a co-worker.").  When the alleged harasser is a co-worker, an employer may be held liable only "if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  Curry, 195 F.3d at 660.  "While the reasonableness of an employer's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the [co-worker] negligence standard, where she bears the burden of establishing her employer's negligence, than under the [supervisor] vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence."  Id. at 660 (citing Shaw v. AutoZone, Inc., 180 F.3d 806, 812 n. 2 (7th Cir. 1999) ("[T]he reasonableness of the employer's

actions in preventing and responding to sexual harassment is relevant under both standards, the difference being who bears the burden of proof.").

Nowhere in Title VII is the term "supervisor" defined.  However, other courts have considered whether the alleged harasser had the authority "to affect the terms and conditions of the victim's employment . . . [which] primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." See Jones, 346 F. Supp. 2d at 45 (citing Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033 (7th Cir. 1998).  Based on the record before it, the Court concludes that Pearson was Johnson's co-worker and not Johnson's supervisor. Although Pearson was a "supervisor" in the Department of Veterans Affairs Substance Abuse Response Program, see Pl.'s Stmt. at 3 ("[a]t the time of his deposition in 2010, Pearson's title was Health Systems Specialist, Supervisor . . . ."); see also Def.'s Mot. for Summ. J. at 2 ("Isaiah Pearson supervised drug rehabilitation counselors at SARP"), and did occasionally appear "bossy" to Johnson, see Clark-Stone Dep. 110:11-17, 152:18-21, Johnson concedes that Pearson was not a supervisor in her chain of command, Pl.'s Stmt. at 3, and does not allege that Pearson had the power to "hire, fire, demote, promote, transfer, or discipline" her.

In order to hold an employer liable for a hostile work environment caused by co-worker harassment, Johnson must present evidence that the Secretary knew or should have known of the accused's harassing conduct and that the Secretary failed to take prompt and appropriate action to correct this inappropriate behavior.  See Jones, 346 F. Supp. 2d at 45.[2]  The Court will consider these two inquiries by examining the factual record in the light most favorable to the plaintiff.

---

[2]  Because the Court concludes that Pearson was Johnson's co-worker, it need not consider the parties' arguments made with respect to the Secretary's invocation of a defense under Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  The so-called "Faragher defense" is an affirmative defense that allows an employer to avoid liability where it can demonstrate (1) that the employer exercised reasonable care in promptly preventing and correcting the harassing behavior and (2)

**B.      Knew or Should Have Known**

There are two relevant time periods for the Court's inquiry whether a reasonable jury could find that the Department of Veterans Affairs either knew or should have known of the alleged harassment.  The first occurred between 1997 and 2005, which marks the period between the alleged start of Pearson's inappropriate and unwelcome sexual remarks to Johnson and Pearson's alleged first physical touching of Johnson.  See ROI B-1, ¶ 8; Compl. ¶ 7.  The record shows that Johnson's workplace during this time period was filled with sexual banter -- banter that co-workers and Pearson considered part of the joking, humorous atmosphere of the workplace, see, e.g., Givens Dep. 114:9-11 ("We used to tease each other about things that weren't true and make sexual jokes and call each other out."); Taylor Dep. 88:12-14 ("We made a joke about something that you was wearing that day, we might have joked about something sexual."); Pearson Dep.  166:18-19 ("We were just, you know, end of the day we were just having fun talking trash, you know."), but that Johnson now alleges included unwelcome "solicitations for sexual activities, [and] inquiries regarding Plaintiff's private sexual activities," Compl. ¶ 7.  However, Johnson does not allege that anyone in management ever witnessed this alleged verbal harassment or was notified of the harassment until 2005, when Johnson first approached her supervisors regarding Pearson's conduct.  Id.  Until 2005, Johnson states that she did not tell her supervisors about the accused's alleged inappropriate comments, because she "tried to ignore" the comments, and she "thought [she] could handle the talking." Pl.'s Dep. 109:11, 111:21.  Moreover, Johnson's co-workers have testified that the group would refrain

---

that the employee unreasonably failed to take advantage of the corrective or preventive procedures provided by the employer. See id. at 807-08.  However, because the Court has applied the co-worker negligence standard to this case and not the supervisor standard of care, the Faragher defense is inapplicable. See Curry, 195 F.3d at 659-60 (making a distinction between standards of liability "depending on who does the harassing" and noting that plaintiff's negligence, as considered under Faragher, is only relevant if the alleged harasser is a supervisor).

from engaging in sexual banter if a supervisor was present.  <u>See</u> McCray Dep. 97:11-14; Taylor Dep. 92:5-6.

Not only were Department supervisors therefore unaware of the alleged pre-2005 verbal harassment, but courts in this jurisdiction have found that supervisors are under no affirmative duty to discover such harassment when they "had in place a policy against harassment, [they] had made [their] policy known and [they] had established an effective complaint procedure." <u>See</u> <u>Curry</u>, 195 F.3d at 661. It is undisputed that defendant had an established policy in place designed to prevent sexual harassment in the workplace, Pl.'s Stmt. at 17-18 ("Plaintiff does not dispute that Defendant had a prevention of sexual harassment policy in place."), and that Johnson had attended mandatory sexual harassment training during her time at the Department, Pl.'s Dep. 128:2-3.  Because the Department had a prevention of sexual harassment policy in place, it "was entitled to rely on its employees to bring problems with their co-workers to its attention." <u>Curry</u>, 195 F.3d at 661. When considered in conjunction with the active effort on the part of Department employees to hide their sexual banter from their supervisors, there is no genuine factual dispute that defendant did not know and should not have known about any sexual harassment allegations during the period from 1997 to 2005.[3]

---

[3] Although Johnson discusses the escalating nature of Pearson's conduct from 1997 to 2005, her pleadings focus on 2005 as the timeframe for her sexual harassment hostile work environment claim.  Moreover, Johnson does seem to concede that any hostile work environment claim premised on the pre-2005 period would not be successful.  <u>See</u> Pl's Opp.'n to Def.'s Mot. at 8-9 ("Defendant . . . has not produced any evidence that before 2005 there existed sex-based misconduct sufficient to implicate Title VII's prohibition against sexual harassment.").  Admittedly, Johnson's interest in disregarding the time period between 1997 and 2005 relates to her response to the Secretary's assertion of the "<u>Faragher</u> defense." See Pl.'s Opp.'n to Def.'s Mot. at 9-10.  However, as previously stated, because the Court has applied the co-worker negligence standard to this case and not the supervisor standard of care, the <u>Faragher</u> defense is inapplicable. <u>See</u> <u>Curry</u>, 195 F.3d at 659-60. Johnson does not contend that the Secretary knew, or should have known, of any misconduct that took place prior to 2005, and accordingly the

The second time period -- and the period that is the focus of the summary judgment motion and the parties' dispute -- is the period in 2005 <u>after</u> Johnson first reported to her supervisors at the Department that Pearson had inappropriately touched her.  <u>See</u> Pl.'s Dep. at 102:1-112:10.  Clearly, the Secretary can be considered on notice of the sexual harassment claims following Johnson's first report to her supervisors, but the exact date of this pivotal first report is in dispute.  The Secretary, relying on ambiguous deposition testimony and on Johnson's response to a 2006 questionnaire, contends that Johnson "did not inform management of Pearson's alleged behavior until after he allegedly first placed 'his hands' on her on July 11, 2005, once [sic] month prior to her leaving work for a period of years." Def.'s Mot. for Summ. J. at 19.  Moreover, the record indicates that Clark-Stone disputes that Johnson informed her of the alleged misconduct at all. <u>See</u> Clark-Stone Dep. 152:2-9.  Johnson disputes this, and claims that she "believes that Pearson started his offensive physical conduct in/about January 2005 and that she first complained to Ms. Karen Clark-Stone within the month thereafter." Pl.'s Stmt. at 10-11; <u>see also</u> Pl.'s Decl. ¶ 3 (Oct. 12, 2010).  Johnson testified that she recalled that the alleged misconduct escalated, and the touching began, at or around the time of the retirement of Mr. Uqdah, who stated that he was officially scheduled to retire in March, but actually left the workplace in January 2005 using his accumulated leave. Uqdah Decl. ¶ 6 (Oct. 8, 2010); <u>see also</u> Pl.'s Decl. ¶ 3 (Oct. 12, 2010).  Johnson also claims that she spoke to Clark-Stone in the timeframe of the "2000s" about Pearson's conduct, and that she spoke to her supervisors, Clark-Stone and Jordan, at least five times prior to alerting the EEO office in August 2005, but that no action was taken with respect to her complaints. Pl.'s Dep. 103:10-107:24; Pl.'s Decl. ¶ 3.

---

Court does not construe her complaint as raising a hostile work environment claim relating to any misconduct by Pearson that took place prior to 2005.

Hence, there is a genuine issue of material fact regarding when, exactly, the Department of Veterans Affairs knew or should have known of the alleged harassment, and whether in light of that knowledge, its response to the complained-of harassment was reasonably prompt and appropriate.  See, e.g., Wade v. Wash. Metro. Transit Auth., Civ. Nos. 01-0334, 01-2385, 2005 WL 1513137, at * 3 (D.D.C. June 27, 2005) (finding that the plaintiff presented evidence that employer "knew or should have known of the abuse" since plaintiff reported each incident to a supervisor, who, under the employer's policies, had a duty to report further allegations to the employer's Office of Civil Rights).

## C.     Prompt and Appropriate Action

A determination whether the Department of Veterans Affairs responded promptly and appropriately to the alleged harassment of Johnson depends on the resolution of the factual dispute (discussed above) regarding whether Johnson first reported the alleged unwelcome physical contact to her supervisors in June or July 2005 -- as argued by defendant -- or in January or February 2005 -- as argued by Johnson.  "To assess whether an employer's response is adequate, courts should look to 'the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment.'" Matta, 2005 WL 3454334, at *32 (citing Curry, 195 F.3d at 662 n.17).

While certain details of the Department's response to Johnson's allegations are in contention, it is undisputed that the Department took several steps to respond to and correct the alleged harassment problems in August 2005.  The Department's responses to Johnson's allegations included the following:  (1) discussions and/or plans to move Johnson to a different

unit within the Department; (2) reprimands of the accused and placement of the accused on administrative leave; (3) completion of a formal investigation into Johnson's allegations; and (4) reiteration of sexual harassment training for employees and supervisors in Johnson's section. Other courts in this district have found similar responses to sexual harassment allegations adequate under the co-worker negligence standard.  See, e.g., Curry, 195 F.3d at 661 (finding the conduct of an investigation and admonishment of the accused to be "appropriate" and "effective" responses to allegations of sexual harassment, even though the defendant "took no formal disciplinary action"); Roof v. Howard Univ., 501 F. Supp. 2d 108, 115-16 (D.D.C. 2007) (finding that training is a reasonable response to notice of alleged harassment).

Whether these actions can be considered "prompt" or "appropriate," however, depends in part on the "amount of time that elapsed between the notice and remedial action." Curry, 195 F.3d at 662 n.17.  If the Department was only notified of the alleged harassment in June or July 2005, these August 2005 personnel actions might very well be sufficiently prompt and appropriate to satisfy the employer's standard of care.  However, if Johnson's account is credited, and she informed her supervisors of the alleged harassment in January or February 2005, the record then reflects a significant period of inaction on the part of Johnson's supervisors in the face of serious sexual harassment allegations, and it is less likely that a reasonable jury would find the Department's responses to be prompt and appropriate in light of such a delay.  This timing question is properly resolved by a jury.  See Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (holding that "[s]ummary judgment . . . is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact").  Because this issue turns on a disputed issue of material fact, the Court cannot conclude based on the record before it that the Department satisfied its duty to respond.  Hence, summary judgment must be denied.

## **CONCLUSION**

For the foregoing reasons, the Court will deny defendant's motion for summary

judgment.  A separate order accompanies this memorandum opinion.


                                            _____/s/_____
                                                    JOHN D. BATES
                                               United States District Judge

Dated: September 19, 2011